**PHILADELPHIA FACILITIES MAN-AGEMENT CORPORATION, Successor in Interest to UGI Corporation, Philadelphia Gas Works Division**

and

**Reliance Insurance Companies, Plaintiffs,**

v.

**The SAINT PAUL FIRE AND MARINE INSURANCE COMPANY,**

and

**J. F. Pritchard & Company, Inc., Defendants,**

v.

**STEWART WARNER CORPORATION, Third-Party Defendant.**

**Civ. A. No. 73–413.**

United States District Court,
E. D. Pennsylvania.

June 17, 1974.

Joseph H. Foster, John B. Brumbelow, Philadelphia, Pa., for plaintiffs.

Stephen A. Cozen, Philadelphia, Pa., for St. Paul Fire and Marine Ins. Co.

Daniel J. Ryan, Philadelphia, Pa., for J. F. Pritchard & Co., Inc.

Earl H. Parsons, Philadelphia, Pa., for third-party defendant.

## MEMORANDUM AND ORDER

FOGEL, District Judge.

A fire which occurred on October 24, 1969, causing extensive damage to a Philadelphia Gas Works liquefied natural gas plant in Philadelphia (hereinafter referred to as LNG) is the genesis of this action which plaintiffs Philadelphia Facilities Management Corporation, successor in interest to UGI Corporation, Philadelphia Gas Works Division (hereinafter referred to as PGW) and Reliance Insurance Companies (hereinafter referred to as Reliance) have brought against defendants St. Paul Fire and Marine Insurance Company, Inc. (hereinafter referred to as St. Paul) and J. F. Pritchard & Company, Inc. (hereinafter referred to as Pritchard). Before us at this stage of the proceedings are motions for summary judgment filed by plaintiffs and by Pritchard.

Those facts which are not subject to dispute may be summarized as follows: At some time prior to May of 1966, PGW decided to build an LNG plant at its facility located at 3100 East Venango Street, Philadelphia. Bids were invited, and Pritchard was selected as the general contractor. Among the provisions of the construction contract was a requirement that Pritchard procure installation floater insurance coverage, naming PGW as an insured.[1] Pritchard had carried such insurance with St. Paul continuously since 1954; the policy provided for inclusion of new construction projects such as the PGW LNG plant within its coverage, subject only to Pritchard reporting the costs of the improvements it had contracted to make to St. Paul for purposes of premium computation. Construction of the plant began, and by the

---

1. The construction contract contains the following provision with respect to installation floater coverage [General Provisions XVII, Page GP–14]:

G. INSTALLATION FLOATER COVERAGE

The Contractor will place in effect and furnish insurance certificates for Installation Floater Coverage against all risks of loss or damage from any cause, whatsoever and wheresoever occurring, including the perils of fire, lightning and those enumerated in the standard Extended Coverage Endorsement and subject to normal limitations and exclusions applying to this type of coverage, including $1,000 Franchise Clause. Coverage applies to property under Contractor's care, control and custody except the inground storage facilities.

Coverage applies on any and all materials, equipment, machinery and appurtenances and other property of any nature whatsoever, shipped by or for the Contractor or in which the Contractor may have an interest or responsibility or for which the Contractor may be liable or assume liability prior to loss or damage, including the value of labor performed in installation. Property is covered while in transit within the United States to place of erection or installation and continuously thereafter while being erected or installed, until the applicable Date of Initial Operation, or the date when Purchaser notifies Contractor that this coverage may be terminated, whichever is later, but not later than completion of Acceptance Tests, any additional premium cost to Contractor subsequent to the date of Initial Operation and prior to such notice to terminate, to be reimbursed by Purchaser. The assured under this coverage shall be the City of Philadelphia, Purchaser, and Contractor.

summer of 1969 had progressed to the stage at which the pressure and mechanical tests mandated by the contract could be conducted. The date of initial operation was August 13, 1969. On October 24, 1969, prior to the commencement of the performance tests called for by the contract, a fire occurred in the LNG plant, causing a loss alleged to total $428,002.55.

PGW notified St. Paul of the loss; St. Paul, however, refused payment, asserting that the coverage under the installation floater policy issued to Pritchard had terminated prior to the occurrence of the fire. PGW subsequently filed a claim with Reliance under an excess policy of insurance issued to PGW, and the claim was paid, less the $100,000.00 deductible in the policy. PGW and Reliance thereafter instituted the present action in this Court against St. Paul and Pritchard, averring that St. Paul wrongfully denied coverage under the installation floater policy, and should have responded to the full extent of the loss, or, in the alternative, that Pritchard was in breach of its contractual obligation to procure such insurance coverage, and was therefore liable for the entire loss, if in fact the St. Paul policy was not in force at the time of the fire.

After a pretrial conference attended by the parties, the Court issued an Order dated July 24, 1973, directing that they embark upon an initial round of discovery limited to the sole issue of the insurance coverage, if any, which existed at the time of the fire.[2] At the conclusion of this phase of discovery plaintiffs filed their motions for summary judgment against St. Paul on the issue of the coverage of the installation floater policy and against Pritchard on the issue of breach of its contractual obligation to procure such insurance. Pritchard joined in the motion against St. Paul.

Oral argument was heard, and extensive memoranda, depositions, and exhib-

its were filed. After consideration of all of these materials, we have concluded that the legal principles which govern the grant or denial of summary judgment dictate refusal of the motion at this stage of the litigation because of the existence of material factual disputes.

Our threshold examination focuses upon the pertinent provisions of the installation floater policy which Pritchard secured from St. Paul as of May 1, 1954, (Policy No. AT10–4040), as modified by the specific endorsement to cover the LNG plant and to include PGW as an additional named insured. Paragraphs 5 and 7 thereof, dealing with insurable interest and period of coverage on location, provide as follows:

5. INTEREST

Covering on all materials, equipment, machinery and appurtenances and other property of any nature whatsoever, shipped by or for the assured or for which the assured may have an interest or responsibility or which the assured may be liable or assumes liability prior to loss or damage including the value of labor performed in erection or installation.

.    .    .    .    .    .

7. COVERAGE ON LOCATION

This insurance covers from the time property passes out of custody of carriers (as specified in paragraph 6) at place of erection or installation and continuously thereafter while being erected or installed, until erection or installation as contracted or agreed by the assured has been completed or tested and accepted by the purchaser.

The crucial clause of the policy in connection with the issue now before us is found in ¶ 7, which calls for coverage "until erection or installation as contracted or agreed by the assured has been completed or tested and accepted by the purchaser." Resolution of the dispute among the parties turns upon a de-

---

2. Other issues in the action, such as St. Paul's third party complaint against Stewart Warner Corporation, the alleged manufac- turer of counter current flow vaporizer units utilized in the LNG plant, are therefore not before the Court at this time.

termination of the fact of completion of the plant as that term is defined under ¶ 7 of the policy at the time of the fire on October 24, 1969.[3]

St. Paul raises a preliminary question pertaining to the choice of law governing the interpretation of the installation floater policy. It asserts that the law of Missouri, the state in which the original 1954 policy was delivered, differs in significant particulars from the law of Pennsylvania, principally with respect to judicial interpretation of the term "completion".

■ It is axiomatic that a federal court in a diversity case must apply the choice of law rule of the forum state. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under the traditional Pennsylvania rule, the construction of an insurance contract is governed by the law of the state in which delivery takes place, if delivery is the last act legally necessary to bring the contract into force. Ruhlin v. New York Life Insurance Company, 106 F.2d 921 (3d Cir. 1939). In 1964, however, the Supreme Court of Pennsylvania in Griffith v. United Air Lines, 416 Pa. 1, 203 A.2d 796 (1964), adopted its current rule which provides that the law of the state controls which has the most significant contacts with and interest in both the occurrence and the parties. The *Griffith* rule has been applied ·to contract cases as well as in tort litigation, the first type of action in which the concept was enunciated by the Supreme Court of Pennsylvania; see Neville Chemical Company v. Union Carbide Corporation, 422 F.2d 1205 (3d Cir. 1970); Readmond v. Matsushita Electric Corp. of America, 355 F.Supp. 1073 (E.D.Pa. 1973). The traditional delivery rule, however, seems to persist in cases involving insurance contracts; First Pennsylvania Banking and Trust Company v. United States Life Insurance Company in the City of New York, 421 F.2d 959 (3d Cir. 1969); Crawford v. Manhattan Life Insurance Co. of N. Y., 208 Pa.Super. 150, 221 A.2d 877 (1966); Eastcoast Equipment Co. v. Maryland Casualty Company, 207 Pa.Super. 383, 218 A.2d 91 (1966).

In the instant case, it appears that while the original 1954 policy was delivered in Missouri, the endorsement naming PGW as an additional insured was delivered in Pennsylvania. Even applying the traditional delivery rule, therefore, it is not at all clear that Missouri law would necessarily apply in the construction of the policy. See generally 8 Vill.L.Rev. 408 (1961).

While the choice of law may become relevant at a later stage in the litigation, it is unnecessary to choose between Missouri and Pennsylvania law at this juncture.

St. Paul asserts that the Court must look to Missouri law to determine and apply a purported legal standard of "completion" with respect to the installation floater policy at issue in the instant case. We have carefully examined the Missouri case cited by St. Paul, Property Owners' Materials Co. v. Byrne, 176 S.W.2d 650 (Mo.App.1944), and two cases from the United States Court of Appeals for the Tenth Circuit, Fireman's Fund Ins. Co. v. Millers' Mutual Ins. Ass'n., 451 F.2d 1140 (10th Cir. 1971), and Hendrix v. New Amsterdam Casualty Company, 390 F.2d 299 (10th Cir. 1968), which apply the standard of "completion" enunciated by the Court in *Property Owners', supra*. These cases stand for the proposition that "[t]he work of merely repairing defects or remedying inferior workmanship [does] not preclude a determination that [a] building [has] been completed for the purposes of [a builder's risk insurance] policy," *Hendrix, supra*, at 304.

While this proposition may become pertinent at a future stage of the proceedings, it is clearly not relevant to a decision upon plaintiffs' motion for summary judgment against St. Paul, which seeks to have us decide now that as a

3. It is apparently conceded that the LNG plant was never "tested and accepted" by PGW.

matter of law the LNG plant had *not* been completed.[4]

██ Moreover, we do not consider the cited cases, and the purported "objective" standard of completion which they are said to embody, as relevant to the determination of coverage in the context of the present motion for summary judgment, because the term, "completion", as used in a policy of installation floater insurance, can only be defined within the context of the construction project which it was intended to insure. "Completion", in reference to a construction project, means whatever the parties to that particular construction contract have intended the term to mean, pursuant to the provisions of the construction contract itself.

The installation floater policy issued by St. Paul to Pritchard recognizes the necessity of incorporation by reference, at least in part, of the construction contract into the insurance policy. Paragraph 7 of the policy provides that coverage extends during erection or installation on location until "erection or installation *as contracted or agreed by the assured* [Pritchard] has been completed or tested and accepted by the purchaser". (emphasis supplied).

We therefore turn to an examination of the pertinent provisions of the construction contract between Pritchard and PGW to determine whether the LNG plant "as contracted or agreed" between these parties was "completed".

The construction contract between Pritchard and PGW is quite specific in its definition of testing and completion of construction. Article 9.0 provides as follows:

Article 9.0—*Acceptance Tests and Completion*

Subject to General Provisions, Section XIII, the following tests shall be performed:

9.01 *Pressure and Mechanical Tests for Liquefaction and Vaporization Facilities*
Pressure and Mechnical Tests for Liquefaction and Vaporization Facilities as described in General Provisions.

9.02 *Performance Tests for Liquefaction and Vaporization Facilities*
After all pressure and mechanical tests are satisfactorily completed on the Liquefaction and Vaporization Facilities and defects, if any, are remedied, Contractor shall notify the Purchaser that the Work is ready for Performance Test, and the Purchaser shall arrange to make a Performance Test within the applicable period specified in Article 4.02. Continuous operation for a period of twenty-four (24) hours in accordance with guarantees (with suitable allowances for deviations to be mutually agreed upon) shall constitute successful completion of Performance Test.

9.03 *Completion of Liquefaction and Vaporization Facilities*
Upon successful completion of Performance Tests or if, for any reason except for Force Majeure, the Purchaser is unable to make a Performance Test on the Vaporization Facilities within the applicable period specified in Article 4.02 following notification by the Contractor or, in the case of the Liquefaction Facilities, is unable to make Performance Test within 6 months from the date of completion of the Pressure and Mechanical Tests, *such Section of*

---

4. St. Paul urges the purported Missouri standard of "completion" as part of its alternative contention that a determination that there are no disputed issues of material fact mandates entry of summary judgment in favor of St. Paul, even in the absence of a motion with respect thereto. Summary judgment in favor of St. Paul would require a determination that, as a matter of law, the LNG plant had been "completed" or "tested and accepted by the purchaser" prior to the loss. Because of our disposition of plaintiffs' motion for summary judgment, we do not reach St. Paul's alternative contention, nor the standards of Missouri law urged in support thereof.

*the Work shall be considered satisfactorily completed.* No action founded upon the performance guarantees will lie against the Contractor unless the Contractor receives notice in writing within seven (7) days after the results of the Performance Tests are ascertained, setting forth the fact that the plant or equipment is not satisfactory. Particulars to follow in due course. (emphasis added)

\*     \*     \*     \*     \*     \*

Article 4.02 of the construction contract, which is referred to in Articles 9.-02 and 9.03, originally provided as follows:

Article 4.0—*Terms of Payment*

\*     \*     \*     \*     \*     \*

4.02 *Final Payment*

The final five (5%) percent, for each Section of the work, i. e., (1) Liquefaction Facilities, (2) Vaporization Facilities and (3) the Storage Unit, which represents the balance of the contract price, will be due and payable upon completion of each such Section and upon furnishing by Contractor of satisfactory evidence that all outstanding liabilities, claims for injuries to persons, damage to property, claims and liens for labor and materials, taxes, charges, workmen's compensation payments and other payments or charges for which the Contractor may be liable and which have been fully paid and satisfied or are fully covered by insurance or by other adequate provision. *Each Section should be considered fully performed upon completion of Acceptance Tests as hereinafter provided for in this agreement;* provided, however, if upon satisfactory completion of the Pressure and Mechanical Tests and full compliance with the provisions of the preceding sentence, the Purchaser cannot for any reason beyond the control of the Contractor conduct the Performance Tests within the times set forth below for any Section, this contract shall thereafter be considered *for the purposes of payment* to be completed with respect to such Section, and in such case the Purchaser shall make final payment to the Contractor for each Section:

a.  Liquefaction Section—60 calendar days thereafter

b.  Storage Section—250 calendar days thereafter

c.  Vaporization Section—

Thirty (30) calendar days after the date when the following two conditions have been met:

(i) the Pressure and Mechanical tests have been completed, and

(ii) the Storage facility contains sufficient LNG to permit conduct of the Performance Test, provided, however, that if these conditions are met less than 30 days from the next ensuing March 15, the Performance Tests shall be made as early as possible thereafter, but in any event not less than 425 days after completion of the Pressure and Mechanical Tests. If the provision of sufficient LNG in the Storage facility is delayed for a period in excess of 5 days after completion of the Pressure and Mechanical Tests for reasons within the control of the Contractor, then the said 425-day period shall be extended for a period equal to the total period of such delay. (emphasis added)

In August of 1968, however, Pritchard notified PGW that construction of the inground LNG storage facility, as originally required under the terms of the contract, should be abandoned. This recommendation was adopted by PGW, and a Contract Modification Agreement was entered into by Pritchard and PGW on May 29, 1969, which reflected the reduced scope of the project. Since the performance tests specified in Article 4.-02 of the contract called for a storage facility, Paragraph 3 of the Contract Modification Agreement extended the

period within which these tests could be conducted:

### 3. *Final Payment.*

PGW agrees to run the required Performance Tests on the Liquefaction and Vaporization Sections of the Plant as soon as is reasonably possible and the time limits specified in clauses "a" and "c" of Article 4.02 of the Construction Contract for the conduct of Performance Tests on the Liquefaction and Vaporization Sections of the Plant are hereby changed as follows:

a. Liquefaction Section—Twenty four (24) months after satisfactory completion of Pressure and Mechanical Tests (based on the installation of three of the six compressors), but no later than July 31, 1971; provided, however, that if no performance test shall have been conducted within such period, only one-half of the retainage shall be paid to Contractor, the balance to be paid upon completion of a satisfactory Performance Test following installation of all six compressors, but no later than July 31, 1973, PGW to pay interest on such retainage, at the prime rate prevailing from time to time, from July 31, 1971 to date of payment.

c. Vaporization Section—Thirty (30) calendar days after the date when the following two conditions have been met:

(i) the Pressure and Mechanical tests have been completed, and

(ii) PGW has in storage sufficient LNG to permit conduct of the Performance Test, provided, however, that if these conditions are met less than 30 days from the next ensuing March 15, the Performance Tests shall be made as early as possible thereafter but in any event not later than March 15, 1972.

Payment of any retainage prior to the completion of the applicable Performance Test shall not relieve the Contractor of responsibility for the particular performance guaranty.

Section XIII of the General Provisions of the construction contract, referred to in Article 4.02, contain additional provisions relating to testing and completion:

### XIII. TESTING AND COMPLETION OF CONSTRUCTION

Purchaser's representative may witness such of the procedures and checks hereinafter referred to in this section as they desire, but in any event Contractor will certify the results of the tests to Purchaser and Purchaser, if requested, shall certify in writing that such tests were performed. If requested by Purchaser, Contractor will submit for Purchaser's approval such of the testing procedures as may be specified in Purchaser's request.

### A. *Pressure Tests*

When in the opinion of the Contractor any portion of the Work is ready for pressure tests, the Contractor shall so advise Purchaser twenty-four (24) hours in advance so the Purchaser may arrange for a representative to be present to witness such tests. Tests of the component parts of the Work shall be made for the purpose of determining whether such parts conform to the specifications. Pressure tests shall be conducted in accordance with design codes specified herein for equipment units and operating lines. It is agreed that a satisfactory pressure test of any component part of the Work for a reasonable period, not to exceed two (2) hours, except as necessary to comply with recommendations of the applicable Code, shall be deemed sufficient to demonstrate that the Component is capable of performing its function. If defects or leaks occur during these tests, the Contractor shall remedy same.

B. *Mechanical Tests*

Contractor shall prepare the facilities and perform checks as follows: furnish and install start-up screens in all fluid inlet lines to machines; install packing for all rotating and reciprocating machines; align and lubricate pump couplings; take reasonable precautions to remove loose material from all lines by flushing or blowing; remove loose material from vessels before heading-up; check that drips and drains are free and open; service and adjust instruments, excluding relief valve; check direction of rotation of all rotating equipment; check speed of turbines and other drivers; megger all motors and generators; megger all electric circuits; check and adjust all relays, contactors, starters, circuit breakers and switches; check phase rotation of alternating current generators; pull all blinds; fill instruments with necessary fluid; and install lubricating and seal oil in pumps and drivers.

C. *Readiness to Operate*

When the facilities of a Section of the Work have been tested and completed in accordance with the drawings and specifications to the satisfaction of the Purchaser (except for incidental work such as grading, roads, certain painting and insulation, etc.) and the procedures and checks provided in the preceding paragraphs have been accomplished, the particular Section shall be deemed "ready to operate" and the Contractor shall so advise Purchaser in writing. Until such notice is given, no part of the facilities shall be used except for testing, stress relieving or other construction purposes; but after receipt of written notice from Contractor, Purchaser shall on a mutually agreeable date, hereinabove defined as the Date of Initial Operation, accept care, custody and control of such Section of the Work.

D. *Completion of Construction*

*After facilities are ready to operate as hereinabove defined, Contractor shall complete the construction by finishing any insulation, painting, grading and other work required, which may remain to be done.* Purchaser shall cooperate with Contractor in order that such work may be accomplished expeditiously. When the items enumerated in this paragraph have been accomplished, *Contractor shall notify Purchaser in writing and Purchaser shall acknowledge that the construction is physically complete, or shall notify Contractor of any work remaining to be done.*

E. *Performance Test*

Unless detailed otherwise in the Agreement, performance tests, if required, shall be made only with units clean, inside and outside and equipment in first class state of repair. Any cleaning or repair necessary after the Purchaser has accepted care, custody and control shall be at its expense. Contractor shall supervise such tests at its expense. Complete copies of all test data and results shall be furnished Contractor.

Purchaser shall, at its expense, make all operational preparations, furnish all operating and testing personnel, furnish all fuel, water, light, power, chemicals, raw materials and any other supplies, furnish and install all necessary appliances for weighing or measuring water, fuel and refuse, furnish all instruments required for test and all fuel, gas and other required analyses.

In cases of failure to meet performance guarantees, Contractor, at Contractor's expense, shall make necessary adjustments or change or replace the equipment furnished so that guaranteed performance will be obtained. (Emphasis added)

It is clear from an examination of these portions of the construction con-

tract that the parties contemplated the following sequence of events with respect to completion of the facility:

1. *Pressure and mechanical tests.* It is undisputed that these tests were completed prior to August 13, 1969.

2. *Date of initial operation.* It is similarly undisputed that Pritchard notified PGW on August 13, 1969, that the liquefaction-vaporization plant was ready to operate as of that date. Certain designated items remained to be corrected, but these corrections were completed to PGW's satisfaction by September 8, 1969. The latter date was therefore the date upon which the plant was submitted by Pritchard to PGW for its "care, custody and control", within the meaning of Section XIII–C of the General Provisions.

3. *Completion of construction.* Section XIII–D of the General Provisions provides that after the plant is turned over to PGW for its "care, custody and control", Pritchard is to "complete the construction by finishing any insulation, painting, grading and other work required, which may remain to be done." There is a substantial question with respect to the amount of work, if any, which remained to be completed at the time of the fire.

4. *Notification that the construction is physically complete.* Section XIII–D further provides that, upon completion of the work enumerated in that paragraph, Pritchard is to notify PGW in writing, and PGW is to acknowledge, that the construction is "physically complete". It is undisputed that such notification was not delivered to PGW before the fire.

5. *Performance tests.* It is also uncontested that performance tests had not been conducted at the time of the fire. Article 4.02, as modified, substantially extended the period within which PGW was required to conduct these tests.

To grant summary judgment for plaintiffs upon this record, therefore, we would have to conclude, as a matter of law, that either the performance tests, or the notification that the construction is physically complete, are conditions precedent to a finding that the LNG plant was "complete", within the meaning of the installation floater policy, at the time of the fire on October 24, 1969. Since it is undisputed that neither of these contractual requirements was fulfilled, a determination that either step was necessary to "completion" would decide the issue of insurance coverage in favor of plaintiffs.

We deal first with performance tests. Plaintiffs argue that the fact that these tests were never performed is crucial to a determination of coverage under ¶ 7 of the installation floater policy. St. Paul, on the other hand, contends that the performance tests are irrelevant to the issue of "completion" within the meaning of ¶ 7, and relate solely to the payment of retainages due under the terms of the construction contract.

There is superficial support for plaintiffs' position in Article 9.03 of the construction contract, which provides that, upon successful completion of the performance tests, or after the passage of a specified period within which the performance tests are not conducted by PGW, "such Section of the Work shall be considered satisfactorily completed." This provision is to be read in conjunction with a similar provision in Article 4.02, as originally drafted, which provides that each section of the work "should be considered fully performed upon completion of Acceptance Tests as hereinafter provided for", or after the passage of a specified period within which PGW fails to conduct these tests. Both of these provisions seem, on their face, to link "completion" with the required performance tests.

But the original Article 4.02 was predicated on the assumption that Pritchard would construct storage facilities for LNG adequate to permit performance tests. When the storage facilities were abandoned, Pritchard no longer had any control with respect to the time the performance tests would be conducted, since Pritchard had nothing to do

with the design and installation of the alternate storage facility.[5] The contract modification agreement of May 29, 1969, reflected this lack of control on the part of Pritchard, and extended the cutoff date for the performance tests until July 31, 1971, at the latest, in the case of the liquefaction section, and until March 15, 1972, at the latest, in the case of the vaporization section. PGW further agreed to conduct the performance tests as soon as "reasonably possible".

■ Under these circumstances, we cannot say that performance tests, which could have been performed two years or more after the completion of pressure and mechanical tests and the date of initial operation, and which were solely within the control of PGW, are conditions precedent to "completion" of the "erection or installation" of the LNG facility within the meaning of ¶ 7 of the installation floater policy. On the contrary, it is clear that performance tests, within the context of the modified construction contract, fall within the alternative clause of ¶ 7, viz., testing and acceptance by the purchaser. Under the terms of the contract modification agreement, therefore, conducting performance tests was relevant, not to "completion", as that concept is articulated in ¶ 7, but rather to the payment

of retainages by PGW and the guarantees of performance by Pritchard.

We therefore reach the second possible ground upon which summary judgment could be granted; namely, that notification to PGW by Pritchard that the plant was "physically complete" is a condition precedent to "completion" as that term is used in ¶ 7; the argument is that such notification was never received, and, hence, the plant as a matter of law had not been "completed" at the time of the fire.

■ It is clear from Section XIII–D of the General Principles that once Pritchard determined that the required insulation, painting, grading and other such work had been completed, it was to notify PGW, which could respond by acknowledging that this work had in fact been completed, or, alternatively, by notifying Pritchard that further such work remained to be done. This process of notification and acknowledgment, while contractually mandated, was not itself part of the physical completion of the LNG plant, but was merely a convenient method by which the parties could come to an agreement that the plant had in fact been physically completed according to the specifications in the contract. In the context of ¶ 7 of the insurance policy notification and acknowledgment

---

5. Pritchard's lack of control over the date of the performance tests is clear from the deposition of Henry J. Post, a PGW engineer assigned to the LNG project.

Q. Now, would you tell us what the purpose of that contract modification was?
A. The purpose of the contract modification was to set forth the revised contract price.

&ast; &ast; &ast; &ast; &ast;

Q. What other purpose, if any, was served by that contract modification agreement? Directing you specifically with reference to the doing of performance tests.
A. The time period within which the performance tests were to be performed was extended from the original contract.
Q. Would you explain why that was?
A. It was due to the fact that the storage facility originally contemplated under the contract, namely the inground storage tank, had been abandoned which precluded

our capability for performing these performance tests, since an essential ingredient to permit the performance tests was a means of storing the liquid.
Q. Is it a fair statement, sir, that the original contract, as far as the doing of the performance tests, was keyed in the inground storage facility, and since the inground storage facility had been abandoned then the new contract was entered into which set forth new dates for the doing of the performance tests?
A. Yes, sir.

(N.T. 11–12)

Q. Now, it's true, is it not, sir, that under the contract modification agreement Pritchard was to have nothing to do whatsoever with the design and installation of this storage facility?
A. That's correct.

(N.T. 45)

were related to the concept of "acceptance" by the purchaser and not to that of "completion" by the contractor.

We therefore conclude that the concept of "physical completion", within the meaning of Section XIII–D of the construction contract, must be equated with the concept "completion", within the framework of ¶ 7 of the installation floater policy. We believe this comports with the accepted usage of the term "completion", and, indeed, in the absence of evidence to the contrary, must be construed to reflect the intent of the parties when striking their insurance bargain because they did in fact distinguish the term "completion", apparently used in its physical sense, from the distinct concepts of "testing" and "acceptance" by the purchaser.

Stripped to its essentials, the issue before us is as follows: *Was the LNG plant "physically complete", as that term is used in the construction contract, before the occurrence of the fire on October 24, 1969?* It is precisely this question which is disputed by the parties, and which cannot be resolved on the basis of the depositions and exhibits which have been submitted in connection with the motion for summary judgment; ultimate disposition of this question requires additional evidence.

Section XIII–D clearly requires Pritchard to finish "any insulation, painting, grading and other work required, which may remain to be done", before the facility may be considered physically complete. We cannot determine, from this record, whether such work in fact remained to be done.

There is reference to the insulation, painting, and grading required by the contract in the deposition testimony of Henry J. Post, the PGW engineer assigned to the LNG project.

Q. Now, can you tell us what, if anything, Pritchard was doing at the facility from August 13, 1969, up until the fire?

A. They were attempting to correct and remedy the deficiencies and the problems that were found after August 13. They were furnishing start-up supervisory services, they were completing work which had not yet been completed such as grading, painting, some installation work.

(N.T. 17)

Later, during the same deposition, Mr. Post testified as follows:

Q. Okay. To your knowledge, sir, as of September 2nd, 1969, had Pritchard completed its construction of the Liquid Faction Facility [sic] as per the original contract and the contract modification agreement?

A. No, sir.

Q. What did they have to do?

A. I can't at this moment enumerate all of the work that they had to do, but I can list broadly some of the work that they had yet to do.

Q. Before you get into that let me just make one clarification: Had they completed all of their work pursuant to the contract and contract modification agreement which had to be done before acceptance tests could be conducted? Now, with that clarification I would like your answer.

\*    \*    \*    \*    \*    \*

THE WITNESS: No.

BY MR. O'CONNOR:

Q. Okay. Tell me what they had to do.

A. They had to complete their contract agreement to furnish the start-up supervisory services; they had to correct and remedy certain defects which had been found subsequent to August 13, which defects had not been completed—which defects had not been completely remedied. And I'm not sure at this moment whether they had yet completed all of their painting and grading and installation work.

Q. Tell me is this painting, grading or installation work necessary for the performance of acceptance tests?

A. I would say no.

(N.T. 55–57)

Mr. Post's testimony with respect to the required painting, grading, insulation, and similar work is obviously inconclusive. There is no further evidence in the record before us pertaining to this pivotal issue.

The testimony by way of deposition of Oscar Fuchs, Pritchard's project manager for the LNG plant, is similarly inconclusive, particularly with respect to the question of whether Pritchard was still in the process of physically completing the facility at the time of the fire, or whether its work related solely to repairs undertaken pursuant to the one year warranty.

Q. Well, can you tell me, from your recollection, whether or not the work, in terms of erection and installation, on the vaporization units, had been completed subject to the performance tests, as of the time you wrote the August 13, 1969 letter, or the September 2, 1969 letter?

A. They had been completed to the point where we achieved care, custody and control, by Philadelphia Gas. So that, basically, our forces, the construction forces, primarily were not there. We still had a construction superintendent there to see about repairing any mechanical items that came up, and he so did. * * *

(N.T. 20)

Significant in this connection is a memorandum from Fred Campbell, of Pritchard, to John Messinger, his assistant, which is dated October 23, 1969, the day before the fire.

Oscar Fuchs advised me the first part of the week that all work would be completed on this project by the last of this week. He further indicated that the terms of the construction contract were sufficiently clear, and would indicate that our Liability so far as the Installation Floater coverage was concerned, would be terminated and we could safely cancel our Installation Floater policy.

As of next Monday, check to make certain that all work is completed and tested and that all men have been pulled off of the job. Then check with Sandy Sutton [an attorney with Pritchard] to verify that according to the contract terms we will be able to cancel our Installation Floater Policy.

■ Based on this record, we must conclude that a disputed issue of material fact exists with respect to the "physical completion" of the LNG facility on October 24, 1969, notwithstanding the testimony of Messrs. Post and Fuchs, and the memorandum of Mr. Campbell, to the effect that the LNG facility was almost physically completed, if not in fact completely so, on the date of the fire.

■ ■ The proscriptions applicable to granting a motion for summary judgment preclude us from deciding controverted issues of fact; rather we may only enter such a judgment when the law is clear and there are no possible material questions of fact extant that could alter the decision as a matter of law. Doubts as to the existence of an issue of material fact must be resolved against the party moving for summary judgment. Sarnoff v. Ciaglia, 165 F.2d 167 (3d Cir. 1947); Toebelman v. Missouri-Kansas Pipe Line Co., 130 F.2d 1016 (3d Cir. 1942).

■ Moreover, the party who moves for summary judgment has the burden of demonstrating that there is no genuine issue of material fact. Fairbanks, Morse & Co. v. Consolidated Fisheries Co., 190 F.2d 817 (3d Cir. 1951). In insurance cases, the rule has been stated that the moving party has the burden of *clearly establishing* that there is no triable issue of fact, and that he is entitled to judgment as a matter of law. 6 Moore's Federal Practice ¶ 56.17 [31], and cases cited therein; see also Supermarkets Operating Co. v. Arkwright Mut. Ins. Co., 257 F.Supp. 273, 276 (E.D.Pa.1966). Plaintiffs have not met their burden at this juncture of the litigation.

■ We will deal briefly with one further contention of plaintiffs in sup-

port of their motion for summary judgment. They assert that, even if there was no coverage under the terms of the installation floater policy at the time of the fire, St. Paul is nonetheless estopped from denying coverage because of certain representations allegedly made to PGW and Pritchard by Harold F. Warner, of the R. B. Jones Insurance Agency. Determination of this issue would involve such questions as the agency of Mr. Warner, and detrimental reliance on the part of PGW and Pritchard. The record submitted in conjunction with the motion for summary judgment is totally inadequate to permit determination of these matters. See Girard v. Gill, 261 F.2d 695 (4th Cir. 1958).

Since the question of insurance coverage remains unresolved, we do not reach plaintiffs' alternative contention that Pritchard was in breach of its contractual obligation to procure such coverage.

For the reasons stated above, the motions for summary judgment against St. Paul filed by PGW, Reliance, and Pritchard will be denied.